## IN THE UNITED STATES DISTRICT COURT OF NEBRASKA

| | | |
|---|---|---|
| AMANDA GIBSON, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | **and** |
| CONCRETE EQUIPMENT COMPANY, INC. D/B/A CON-E-CO, A NEBRASKA CORPORATION, | ) ) ) | **JURY DEMAND** |
| | ) | |
| Defendant. | | |

COMES NOW the Plaintiff, by and through her attorney, for her cause of action again Defendant Concrete Equipment Company, Inc. hereby states the following:

### INTRODUCTION

1. This is an action under the Nebraska Fair Employment Practices Act and Title VII of the Civil Rights Act of 1962, challenging Defendant's unlawful sexual harassment, sex discrimination, and retaliation against Plaintiff.

2. Plaintiff Amanda Gibson was subjected to a hostile work environment based upon her sex while working for Concrete Equipment Company, Inc.

### JURISDICTION AND VENUE

3. Plaintiff Amanda Gibson (hereinafter "Amanda") is a citizen and resident of Washington County, Nebraska.

4.  Defendant Concrete Equipment Company, d/b/a Con-e-co (hereinafter "Coneco"), is a Nebraska Corporation with its principal place of business in Blair, Washington County, Nebraska.

5.  Coneco has, and had at all times material, more than 15 employees.

6.  The acts about which Plaintiff complains occurred in Washington County, Nebraska

7.  This court has original jurisdiction over the federal law claims, and supplemental jurisdiction over the state law claims.

8.  Venue is proper in this court pursuant to 28 USC §1391.

## PROCEDURAL REQUIREMENTS

9.  On approximately November 30, 2015, within 300 days of the acts which she complains, Plaintiff filed a charge of discrimination with the Nebraska Equal Opportunity Commission.

10. On or about May 13, 2016, less than 90 days prior to the filing of this Complaint, Plaintiff received her determination for the NEOC. The Equal Employment Opportunity Commission is expected to issue a dismissal and notice of right to sue before this matter is tried.

## FACTUAL BACKGROUND

11. Amanda was hired by Coneco on or about December 20, 2013, as a Feb Tech Trainee.

12. In approximately January 2014, Bill Tierney (hereinafter "Tierney") told Amanda to stop production and take her hard hat and safety glasses off so he could see what she looked like. Then he declared "not bad." Amanda believed Tierney to be a supervisor because he wore a white hard hat.

13. In approximately March 2014, Amanda was asked out to dinner by Robby Smoot (hereinafter "Smoot"), an Electric Laborer for Coneco. Amanda declined. Smoot also said she "looked good with a rod between [her] legs."

14. On or about April of 2014, Amanda was told by Andrew Anderson (hereinafter "Anderson"), a Foreman for Coneco, he was previously a stripper with the stripper name "horsecock." Anderson then told Amanda that maybe she would "see it one day," in reference to his penis.

15. Upon informed belief, on or about May 2014, someone made the comment to Joe Ueding (hereinafter "Ueding"), a welder at Coneco: "Have you fucked that girl in Trutrough yet?" Amanda was the only girl in Trutrough.

16. Ueding told Amanda about the Trutrough statement. She was offended, but chose to laugh off the statement. She asked, "Is there a pool or something?" Then said "I'd like to get in on that."

17. In approximately June 2014, Jim Murphy, a machinist at Coneco, made comments about how good-looking Amanda was and showed her a picture of a welder in a bikini on his phone.

18. Amanda requested to move to a welding position on or about June 15, 2014. Amanda took the weld demo assessment on or about June 15, 2014. If Amanda had not been an employee, she would have passed her first weld demo. Amanda was told by Gary Stillman, Jr. (hereinafter "Stillman"), the Plant Foreman, she had failed because there is a higher standard for employees than people "off the street."

19. After Amanda was informed she failed her weld demo, Amanda asked when she could retake it and was told Art Keller (hereinafter "Keller"), the Plant Manager, told Stillman Amanda would have to wait "90 days" because of a new rule. Stillman also said Coneco had "never"

required 90 days between weld demos. Beau Craft (hereinafter "Craft), a welder, told Amanda Conenco had invented the "90 day" rule for her.

20. In July of 2014, Amanda made a joke about motorcycles and women. She was disciplined for inappropriate behavior. There were many males in similar positions that routinely used inappropriate and sexual language that were not disciplined.

21. Amanda was eventually allowed to take the weld demo in July of 2014, and passed. She was notified that she could join the team in July of 2014, and later joined the team in early September.

22. In approximately September of 2014, Amanda was written up for wearing earrings. There were other male employees similar to Amanda that would not get written up for safety violations.

23. In approximately September of 2014, Amanda was told by Coartney, "It would be best if [Amanda] didn't speak." Stillman told Amanda to keep her head down and avoid interaction.

24. In approximately September of 2014, Amanda was told by Colt Willis (hereinafter "Willis"), a welder for Coneco, Amanda's voice was too high pitched.

25. In approximately September of 2014, Murphy told Amanda her "girls" looked a little fuller/perkier in reference to her breast. He asked if Amanda had gotten a boob job.

26. In approximately late September of 2014, CJ Coartney (hereinafter "Coartney"), the welding foreman and Amanda's supervisor, told Amanda the cylindrical grinder in the tool room is called the "asshole grinder." He said to Amanda, "if anyone comes into the tool room asking for an asshole grinder, that's what they means, and if that offends you . . ." Coartney then shrugged his shoulders to indicate that he didn't care if Amanda was offended.

4

27. In approximately October of 2014, Amanda was told by Coartney "You know Amanda there are a lot of people who would like to see you fail and some who wonder if you will prove them wrong."

28. In approximately October of 2014, Amanda was asked out by Carlos Parida (hereinafter "Parida"), a welder in the plant assembly department by Coneco. Parida asked Amanda "What do you do when you're not at work? We should go have some fun." Amanda denied his request.

29. In approximately October 2014, after Amanda handed him a tool, Craft told Amanda to "high five." Then Craft said, "Eiffel Tower" which is a reference to a threesome.

30. In approximately October of 2014, Amanda had pop cans in her over jacket pockets. Stillman said to Amanda "Nice cans. Did you pay for those?" referencing Amanda's breasts and implying Amanda had plastic surgery. This was also in reference to the comment Murphy had made about Amanda's breasts being perky. Upon informed belief, Murphy had told other employees that Amanda did have plastic surgery on her breasts.

31. In approximately November 2014, Craft referred to an African American employee of Coneco as a "monkey." Amanda confronted Craft about the comment. Craft then called Amanda "a stupid woman."

32. In approximately December of 2014, Steve Sonderup (hereinafter "Sonderup"), a welder in small parts for Coneco, asked Amanda if she gave backrubs, and asked her to "rub his buddies' back." Amanda told Sonderup, "I do [give back rubs], but not for you."

33. On December 12, 2014, Jerry Schaffer (hereinafter "Schaffer") attempted to grab Amanda's breast. Amanda told Schaffer he "better fuckin' watch it." Someone behind Amanda, asked if Amanda "was going to do anything about it?" in a way to ask if Amanda was going to hit or punch Schaffer. Amanda left the altercation and did not harm Schaffer.

34. Following the incident with Schaffer, Amanda asked Coartney a hypothetical question, similar to the interaction she had with Schaffer. She said "What does the handbook say, hypothetically speaking, if someone grabbed my breast, and I clocked them, what would happen?" Coartney told Amanda if she were to hit anyone, he would consider it work place violence, and she would be terminated immediately and escorted off the property. He also said, "How do we know somebody isn't down in HR right now complaining about you being offensive—you know we've had this with you before." Amanda asked Coartney to keep the meeting confidential because she feared retaliation from her co-workers.

35. Following Amanda's question, Coartney made a statement to the men on the plant assembly team. Amanda was confronted by Crafts who asked her if she "snitched" on Schaffer. Amanda confronted Coartney, and asked why he immediately made a statement. Coartney smiled at Amanda and said he did not use names.

36. In approximately January of 2015, John Rainey (hereinafter "Rainey"), a welder in the small parts department of Coneco, told Amanda she was helpful. He said, "That's what God created woman for." He then made a reference to a "three minute cuddly fire," and said to Amanda, "If only I was younger."

37. In February of 2015, Tony Stover, a welder at Coneco, told Amanda all the bathroom walls say "[Amanda is] nothing but a cum dumpster."

38. On or about February 25, 2015, Amanda had to go outside in the cold, rain, and snow to pick up trash in the yard by herself for hours as a "punishment" for talking in the tool room. There was a male employee in the tool room that did not have to pick up trash or go outside. Amanda walked into the building to warm up on her way back outside and Craft told her to "quit whining and pouting."

39. In March of 2015, Murphy patted Amanda on her butt. Amanda told Murphy not to touch her, and he apologized.

40. In March of 2015, Amanda was counseled by Stillman for a comment she made regarding her underwear riding up. Stillman told her she was being offensive, and they had told her she was being offensive in the past. Amanda asked who found her statement offensive so she could apologize to them. Stillman told Amanda he could not give her that information.

41. Following this disciplinary meeting in March of 2015, Amanda complained to Stillman on the production floor about being treated differently than her male co-workers as they utilized offensive language to her on a regular basis. She used the "cum dumpster" example; that she was asked to give backrubs; and that they would say their balls were so sweaty they were scared to go outside because they might get icicles. She asked Stillman how her male co-workers could make those comments and not be disciplined, but she made a comment about her underwear and she was disciplined. He said, "I know. It's bullshit." Upon information and belief, her male co-workers were never investigated or disciplined for their offensive language and no one investigated her complaint of disparate treatment.

42. On or around March 23, 2015, Amanda witnessed Coartney tell an African American employee of Coneco he could be written up or terminated "right now" for buying a soda during work hours. Other employees were allowed to purchase snacks and drinks during work hours.

43. Amanda asked Stillman if the African American employee could be fired for purchasing the soda. Stillman said Coneco didn't fire anyone, even the people they should fire.

44. The African American employee was written up for "being out of the work area". Upon learning that the employee was written up, Amanda confronted Coartney at the end of the day to tell him he was being unreasonable.

45. On or about March 25, 2015, Amanda gave Coartney and Stillman a piece of art she had made that depicted how her own mistreatment made her feel. She hoped the picture would help Coartney and Stillman have more empathy for the other employees. Amanda also gave them a letter which mentioned that they should not treat the few minority employees differently. The letter states she knew what the African American employee was going through because she was one of the few females at Coneco. The letter also explained the context behind her art work.

46. On or about March 26, 2015, Kari Hockemeier (hereinafter "Hockemeier"), a female human resources employee for Coneco, told Amanda the artwork she had "distributed" was offensive. Amanda had not "distributed" the artwork. She had only handed the letter and artwork to Coartney. Hockemeir told Amanda she was suspended without pay pending a full investigation by Keller. Amanda was told she could not return to the premises until either Hockemeier or Keller called her. Amanda was then escorted off the property by Stillman.

47. On or about March 30, 2015, Amanda received a call at her home from Hockemeier. Hockemeier began to question Amanda and accused her of challenging Coartney. Amanda requested a face-to-face interview.

48. On March 31, 2015, Hockemeier informed Amanda that her employment was terminated because Coartney and Stillman had found her picture offensive. Amanda was also told later she was "ineligible for rehire due to the status of her exit."

49. Coneco's handbook says persons terminated for a policy violation are eligible for rehire after six months."

50. The purported reason for Amanda's termination was a policy violation.

## COUNT I
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICES ACT

## **SEXUAL HARASSMENT, DISCRIMINATION, RETALIATION, AND UNLAWFUL TERMINATION**

51.     Plaintiff repleads paragraph 1 to 50 as if fully set forth herein.

52.     Defendant discriminated against Plaintiff with respect to the terms and conditions of her employment on the basis of her sex and subjected her to sexual harassment, all in violation of the Nebraska Fair Employment Practices Act.

53.     Plaintiff complained to Defendant about the sexual harassment she experienced and otherwise opposed practices made unlawful by the Nebraska Fair Employment Practices Act.

54.     Defendant retaliated against Plaintiff because of her complaints and opposition to the harassment.

55.     Plaintiff's sex and protected activity were motivating factors in Defendant's retaliation and decision to terminate Amanda.

56.     Defendant, and/or its agents with Defendant's authority, made Plaintiff's working conditions intolerable.

57.     As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practices Act.

## COUNT II

## VIOLATION OF THE CIVIL RIGHTS ACT, TITLE VII, SEXUAL HARASSMENT, DISCRIMINATION, RETALIATION, AND WRONGFUL TERMINATION.

58. Plaintiff hereby repleads paragraph 1 through 57 as if fully set forth herein.

59. Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of sex and subjected her to sexual harassment, all in violation of the Title VII of the Civil Rights 1964, as Amended.

60. Plaintiff complained to Defendant about the sexual harassment she experienced and otherwise opposed practices made unlawful by Title VII of the Civil Rights Act of 1962, as Amended.

61. Defendant retaliated against Plaintiff because of her complaints and opposition to harassment.

62. Plaintiff's sex and her protected activity were motivating factors in Defendant's retaliation against her, and Defendant's decision to terminate the Plaintiff.

63. Defendant and/or its agents with Defendant's authority made Plaintiff's working conditions intolerable.

64. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages; benefits; future earnings; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the costs of this actions, and for such other relief as may be just in the

circumstances and consistent with the purpose of Title VII of the Civil Rights Act of 1964, as Amended.

## COUNT III

## RETALIATION IN VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICES ACT

65. Plaintiff hereby repleads 1 to 64 as if fully set forth herein.

66. Plaintiff's complained on March 23, 2015 to Defendant about the racial discrimination she witnessed regarding the discipline of an African American employee and otherwise opposed practices made unlawful by the Nebraska Fair Employment Act.

67. Plaintiff's complaint was a protected activity within the meaning of the Nebraska Fair Employment Practices Act.

68. Defendant retaliated against Plaintiff because of her protected activity.

69. Plaintiff's protected activity was a motivating factor in Defendant's decision to terminate Plaintiff.

70. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages; benefits; future earnings' and other emoluments of employment.

Wherefore, Plaintiff demands judgment against Defendant in an amount which will fully compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the cost of this action, and for other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practices Act.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

71. Plaintiff hereby repleads 1 to 70 as if fully set forth herein.

72. Plaintiff's complained on March 23, 2015 to Defendant about the racial discrimination she witness and otherwise opposed practices made unlawful by Title VII of the Civil Rights Act of 1964, as Amended.

73. Plaintiff's complaint was a protected activity within the meaning of the Title VII of the Civil Rights Act of 1964, as Amended.

74. Defendant retaliated against Plaintiff because of her protected activity.

75. Plaintiff's protected activity was a motivating factor in Defendant's decision to terminate Plaintiff.

76. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages; benefits; future earnings' and other emoluments of employment.

Wherefore, Plaintiff demands judgment against Defendant in an amount which will fully compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the cost of this action, and for other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act of 1964, as Amended.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff, Amanda Gibson, respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendants, their officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of sex and retaliation.

B.    Order the Defendants to pay Amanda Gibson back pay, front pay, compensatory damages, consequential damages and liquidated damages in amounts to be proven at trial, and all other affirmative and equitable relief necessary to eradicate the effects of Defendants' unlawful employment practices.

C.    Direct the Defendants to expunge all negative reports in Plaintiff's personnel file.

D.    Order Defendants to pay Plaintiff punitive damages for its malicious and reckless conduct in amount to be determined at trial.

E.    Award the Plaintiff her reasonable attorneys' fees and expert witness fees.

F.    Award Plaintiff his costs in this action.

G.    Grant such further relief as the Court deems necessary and proper.

## JURY DEMAND

COMES NOW the Plaintiff and hereby requests a trial by jury.

Dated this 9th day of August, 2016.

                                                AMANDA GIBSON, Plaintiff

BY: _____
Kelly K. Brandon, #20734
Fiedler & Timmer, P.L.L.C.
20615 Highway 370
Gretna, NE 68028
(402) 316-3060
(402) 513-6501 (facsimile)
kelly@employmentlawnebraska.com
Attorney for Plaintiff